Rebecca **SERNOVITZ** and Lawrence Sernovitz, Individually and as Parents and Natural Guardians of Samuel Sernovitz, Appellants

v.

Stuart Z. **DERSHAW**, M.D., John Stack, M.D., Laura Borthwick–Scelzi, M.D. Margaret M. Fillinger, CRNP, Women's Care of Montgomery County, Holy Redeemer Hospital and Medical Center and Holy Redeemer Health System, Inc., Appellees.

Superior Court of Pennsylvania.

Argued Aug. 21, 2012.

Filed Nov. 14, 2012.

Reargument Denied Jan. 15, 2013.

Theodore J. Caldwell, Jr., Philadelphia, for appellants.

Barbara S. Magen and Sheila A. Haren, Philadelphia, for appellees.

BEFORE: FORD ELLIOTT, P.J.E., DONOHUE, J. and McEWEN, P.J.E.

**OPINION BY DONOHUE, J.:**

Rebecca Sernovitz ("Rebecca") and Lawrence Sernovitz ("Lawrence"), individually and in their capacities as the parents and natural guardians of Samuel Sernovitz ("Samuel") (collectively, "Appellants"), appeal from the order of the Court of Common Pleas, Montgomery County, granting the preliminary objection in the nature of a demurrer filed by Stuart Z. Dershaw, M.D., John Stack, M.D., Laura Borthwick–Scelzi, M.D., Margaret M. Fillinger, CRNP, Women's Care of Montgomery County, Holy Redeemer Hospital and Medical Center, and Holy Redeemer Health System, Inc. (collectively, "Appellees").[1] Because we conclude that 42 Pa. C.S.A. § 8305, which prohibits actions for wrongful birth and wrongful life, is unconstitutional as the manner in which it was enacted violated Article III, Section 3 of the Pennsylvania Constitution, we reverse the trial court's grant of preliminary objections, reinstate the amended complaint, and remand for further proceedings.

According to Appellants' amended complaint, Rebecca sought care from Appellees after becoming pregnant in December 2007 or January 2008. Because both she and her husband, Lawrence, are of Ashkenazi Jewish heritage, their child was at increased risk of being afflicted with certain genetic disorders.[2] Thus, in February 2008, she underwent blood tests to determine, *inter alia*, if she was a carrier of certain gene mutations, at the recommendation of Dr. Stack.

---

1. According to Appellants' amended complaint, Women's Care of Montgomery County is owned by Holy Redeemer Hospital, and both are part of the Holy Redeemer Health System. Doctors Dershaw, Stack and Borthwick–Scelzi, and Nurse Fillinger are employed therein and share a practice.

2. The population of Jewish people from Eastern Europe are known as Ashkenazi. Their children are at greater risk of genetic disorders, including Bloom syndrome, Fanconi anemia, Canavan disease, cystic fibrosis, familial dysautonomia, Gaucher disease, Mucolipidosis IV, Niemann–Pick disease, and torsion dystonia. http://children.webmd.com/tc/ashkenazi-jewish-genetic-panel-ajgp-what-are-ashkenazi-jewish-genetic-diseases.

Appellants allege that the testing revealed that Rebecca is a carrier of the gene mutation that causes familial dysautonomia ("F.D.") but Appellees did not inform Rebecca of the results. Rather, at a March 3, 2008 office visit, Dr. Dershaw told Rebecca all tests were negative, *i.e.*, Rebecca was not a carrier of any of the gene mutations for which she was tested. At a subsequent appointment on May 8, 2008, Dr. Borthwick–Scelzi likewise did not indicate that Rebecca was a carrier of the gene mutation that causes F.D.

Samuel was born in September 2008. In December 2008, Appellants were told that he might be suffering from F.D. According to Appellants, this would only be possible if both parents were carriers of the gene mutation that causes F.D. Rebecca called Appellees, and learned for the first time that she is a carrier, and that she was misinformed about the February 2008 blood test results.

On August 19, 2010, Rebecca and Lawrence filed a complaint against Appellees alleging causes of action for wrongful birth on their own behalf and wrongful life on behalf of Samuel. Therein, they asserted that Appellees were professionally negligent in failing to inform Appellants that Rebecca was a carrier of the gene mutation that causes F.D. Had they known, Appellants state that Lawrence would have also been tested, revealing that he too was a carrier. This, in turn, would have prompted further testing to determine if Samuel would be born with F.D. Because they were not so informed, they were not given the opportunity to determine whether they should terminate the pregnancy. Appellants sought damages for expenses related to the birth and care of Samuel, emotional distress, pain and suffering, humiliation, mental anguish, anxiety, fear, and loss of enjoyment of life. They included claims of *respondeat superior* against Holy Redeemer Hospital and Holy Redeemer Health Care System, Inc., and corporate negligence against Women's Care of Montgomery County, Holy Redeemer Hospital, and Holy Redeemer Health Care System, Inc. Appellants further asserted in their complaint that the statute prohibiting causes of action for wrongful birth and wrongful life (42 Pa. C.S.A. § 8305)[3] was unconstitutional, as the manner by which it was enacted violated Article III, Sections 1, 3, 4, and 6 of the Pennsylvania Constitution. Appellants appended to their complaint Certificates of Merit as to each of the named defendants. Because Appellants alleged that Section 8305 is unconstitutional, they further in-

---

**3.** The law in question states:

(a) **Wrongful birth.**—There shall be no cause of action or award of damages on behalf of any person based on a claim that, but for an act or omission of the defendant, a person once conceived would not or should not have been born. Nothing contained in this subsection shall be construed to prohibit any cause of action or award of damages for the wrongful death of a woman, or on account of physical injury suffered by a woman or a child, as a result of an attempted abortion. Nothing contained in this subsection shall be construed to provide a defense against any proceeding charging a health care practitioner with intentional misrepresentation under the act of October 5, 1978 (P.L. 1109, No. 261),

known as the Osteopathic Medical Practice Act, the act of December 20, 1985 (P.L. 457, No. 112), known as the Medical Practice Act of 1985, or any other act regulating the professional practices of health care practitioners.

(b) **Wrongful life.**—There shall be no cause of action on behalf of any person based on a claim of that person that, but for an act or omission of the defendant, the person would not have been conceived or, once conceived, would or should have been aborted.

(c) **Conception.**—A person shall be deemed to be conceived at the moment of fertilization.

42 Pa.C.S.A. § 8305 (footnotes omitted).

cluded proof that they served a copy of the complaint upon the Office of the Attorney General of Pennsylvania as required by Pa.R.A.P. 521(a).[4] Appellants filed an amended complaint on October 6, 2010, including a paragraph asserting that if Appellants had been appropriately informed, Rebecca would have undergone an abortion "rather than bringing a child into this world who would be destined to suffer from [F.D.] and to endure a lifetime of extreme and debilitating suffering and, ultimately, a premature death." Amended Complaint, 10/6/10, at ¶ 41.[5]

Appellees filed preliminary objections to the complaint on September 20, 2010 and to the amended complaint on October 22, 2010, seeking dismissal of the amended complaint with prejudice for legal insufficiency, as Appellants' claims for wrongful birth and wrongful life are barred by Section 8305. Appellees asserted that Appellants failed to carry their burden of persuasion that the statute is unconstitutional. Thereafter, the parties filed a series of briefs in support of their respective positions. On December 20, 2011, the trial court granted Appellees preliminary objections, rejecting Appellants' constitutional challenge and dismissing their amended complaint. This timely appeal followed.

In the court below and on appeal, Appellants acknowledge that Pennsylvania law, specifically, the wrongful birth and wrongful life statute, currently precludes them from bringing the causes of action contained in their amended complaint. *See* Appellants' Brief at 14. They assert, however, that Senate Bill 646 of 1987 session of the Pennsylvania Legislature ("SB 646"), signed into law as Act 47 of 1988, by which Section 8305 was enacted, violates the Pennsylvania Constitution in several respects, and thus Section 8305 must be stricken. *See id.* at 4, 15. Appellants' specific constitutional challenges are as follows:

1. Was Act 47, which as enacted has as its primary purpose addressing post-conviction relief and other issues of criminal law, but which was amended to include the 'wrongful birth statute' (42 Pa.C.S. § 8305), passed in violation of the 'single subject' requirement of Article III, Section 3 of the Pennsylvania Constitution?

2. Should Act 47, the primary purposes of which as enacted was to address post-conviction relief and other issues of criminal law[,] be severed so that provisions that do not fall within the primary legislative purpose, particularly § 8305, be declared unconstitutional?

3. Was Act 47, which originated as a bill concerning substitute bail commissioners, amended so as to change its original purpose in violation of the dictates of Article III, Section 1 of the Pennsylvania Constitution?

4. Was Act 47, which was only considered in its final form on one day in each House, properly considered on three different days in each House of the General Assembly as required by Article III, Section 4 of the Pennsylvania Constitution?

*Id.* at 4.[6]

---

**4.** We note our concern and consternation that the Office of the Attorney General chose not to participate in this case either before the trial court or in this Court on appeal. We are left to conclude that the outcome of this case and the fate of the statutes at issue are not significant to the Commonwealth.

**5.** The failure to include this assertion was identified by Appellees in their preliminary objections to the original complaint as a failure to plead causation. *See* Preliminary Objections, 9/20/10, at ¶ 29.

**6.** Based upon our resolution of the first and second issues, we need not address the third

■ As this appeal results from the grant of Appellees' preliminary objection in the nature of a demurrer, our standard of review requires that we determine whether the trial court committed an error of law. *Feingold v. Hendrzak,* 15 A.3d 937, 941 (Pa.Super.2011).

> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Id.*

Moreover, in reviewing constitutional challenges to a statute, we are mindful that "[a] statute duly enacted by the General Assembly is presumed valid and will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution." *W. Mifflin Area Sch. Dist. v. Zahorchak,* 607 Pa. 153, 163, 4 A.3d 1042, 1048 (2010) (citation and quotation omitted). "This includes the manner by which legislation is enacted." *Pennsylvanians Against Gambling Expansion*

*Fund, Inc. v. Commonwealth,* 583 Pa. 275, 292, 877 A.2d 383, 393 (2005) ("*PAGE*"). All doubts regarding a statute's constitutionality are to be resolved in favor of constitutionality, and thus a party challenging the constitutionality of a statute bears a very heavy burden of persuasion. *Id.* This is a pure question of law, and thus our scope of review is plenary. *W. Mifflin Area Sch. Dist.,* 607 Pa. at 163, 4 A.3d at 1048.

The constitutional focal point of Appellants' first issue is what is commonly referred to as the "single-subject rule" contained in Article III, Section 3 of the Pennsylvania Constitution, which states: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." PA. CONST. art. III, § 3.[7] The purpose of the creation of Article III was "to place restraints on the legislative process and encourage an open, deliberative and accountable government." *City of Philadelphia v. Commonwealth,* 575 Pa. 542, 573, 838 A.2d 566, 585 (2003) (citation omitted).

> This Article was included in the Pennsylvania Constitution of 1874, which was drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations, especially the great railroad corporations. It was the product of a convention whose prevailing mood was one of reform[.] [ . . . ][A]s these mandates

---

and fourth issues raised by Appellants on appeal regarding violations of Article III, sections 1 and 4 of the Pennsylvania Constitution. *See* Appellants' Brief at 4, ¶¶ 3–4; *see also* PA. CONST. art. III, § 1 ("No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose."); PA. CONST. art. III, § 4 (stating, in relevant part, that bills must be considered on three separate days in each House).

7. Appellants do not raise any argument regarding the clarity of the title of SB 646. We therefore limit our analysis to the subjects contained in SB 646. *See PAGE,* 583 Pa. at 294, 877 A.2d at 394 (indicating that the contents of a bill and its title are two separate considerations when determining constitutionality under Article III, Section 3).

survived the more recent constitutional revisions, they continue to reflect important policies relating to the nature of the deliberative process.

*Id.* at 573–74, 838 A.2d at 585–86 (internal citations and quotations omitted).

The single-subject requirement of Article III, Section 3 serves a variety of purposes, including: (1) preventing the attachment of unpopular riders that would not become laws on their own to popular bills that are sure to pass;[8] (2) providing for a more considered review of bills brought before the General Assembly, as a bill addressing a variety of subjects is less likely to get such attention; and (3) protecting the integrity of the Governor's veto power.[9] *Id.* at 574, 575 n. 18, 838 A.2d at 586, 586 n. 18.

The requirement that all bills relate to a single subject does not mean that any addition to a bill as it passes through the General Assembly renders that bill unconstitutional. Over 100 years ago, our Supreme Court set forth the definition of a "subject" in this context as "[t]hose things which have a 'proper relation to each other,' which fairly constitute parts of a scheme to accomplish a single general purpose, 'relate to the same subject' or 'object.'" *Payne v. School Dist. of Borough of Coudersport,* 168 Pa. 386, 389, 31 A. 1072, 1074 (1895). "[P]rovisions which have no proper legislative relation to each other, and are not part of the same legislative scheme, may not be joined in the same act." *Id.* In other words, the single-subject rule simply requires that the added provisions "assist in carrying out a bill's main objective or are otherwise 'germane'

to the bill's subject as reflected in its title." *City of Philadelphia,* 575 Pa. at 575, 838 A.2d at 587 (citations omitted). As our Supreme Court explained, there must be a balance between judicial oversight and legislative freedom:

'[N]o two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough.' Thus, defining the constitutionally-valid topic too broadly would render the safeguards of Section 3 inert. Conversely, the requirements of Section 3 must not become a license for the judiciary to 'exercise a pedantic tyranny' over the efforts of the Legislature. Indeed, '[f]ew bills are so elementary in character that they may not be subdivided under several heads . . . .'

*PAGE,* 583 Pa. at 296, 877 A.2d at 395–96 (internal citations omitted); *see also City of Philadelphia,* 575 Pa. at 578 n. 20, 838 A.2d at 588 n. 20 (reciting the *"reductio ad absurdum* argument" advanced by petitioners "that all legislation pertains to the single subject of 'law' ").

With this background in mind, we turn to Appellants' first argument on appeal. Appellants contend that SB 646 violates Article III, Section 3, as the bill contains several different statutes that address a variety of subjects not germane to one another, and that the stated purpose of SB 646—amending Title 42 of the Judicial Code—is overbroad and insufficient to satisfy the requirements of Section 3. Appellants' Brief at 16, 20–21. The trial court responded to this argument by upholding the constitutionality of Section 8305 exclusively based upon a Commonwealth Court

---

**8.** This is a practice commonly known as "logrolling," *i.e.,* "embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all."

*City of Philadelphia,* 575 Pa. at 574, 838 A.2d at 586 (citation omitted).

**9.** Apart from appropriation bills, the Governor may only approve or disapprove bills in their entirety. *Id.* at 575 n. 18, 838 A.2d at 586 n. 18.

decision, *North–Central Pennsylvania Trial Lawyers Ass'n v. Weaver*, 827 A.2d 550 (Pa.Cmwlth.2003) (*"NCPaTLA "*). Trial Court Opinion, 12/20/11, at 5.

We begin by addressing the basis for trial court's decision in this case. In *NCPaTLA*, the Commonwealth Court, sitting as a court of original jurisdiction, held, in relevant part, that Act 127, relating in part to venue in medical professional liability actions, did not violate Article III, Section 3, based upon its conclusion that the statutes contained in the Act relate to a single subject, *to wit,* amending Title 42 of the Judicial Code. *NCPaTLA*, 827 A.2d at 556–57, 560. The trial court's reliance on this case for the purposes of this appeal is troubling for two reasons. First, opinions of the Commonwealth Court are not binding on this Court. *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 285 n. 9 (Pa.Super.2010), *appeal denied*, 611 Pa. 675, 27 A.3d 1015 (2011). Second (and more importantly), jurisprudence of the Pennsylvania Supreme Court and this Court mandate the opposite result. *See, e.g., City of Philadelphia*, 575 Pa. at 579–81, 838 A.2d at 589–90; *Commonwealth v. Neiman*, 5 A.3d 353 (Pa.Super.2010) (*en banc*), *appeal granted in part*, 611 Pa. 419, 27 A.3d 984 (2011).[10]

*City of Philadelphia* involved the constitutionality of Senate Bill 1100 of 2002 ("SB 1100"), which contained several provisions amending Title 53 (relating to Municipal Corporations). When first drafted, SB 1100 contained a single substantive provision providing for the inclusion of a citizenship requirement for board members of business improvement district authorities pursuant to the Municipality Authorities Act. *City of Philadelphia*, 575 Pa. at 550, 838 A.2d at 571. Following Senate approval, the bill was sent to the House of Representatives where it underwent three relatively minor changes over the next seven months, ultimately passing in the House.

SB 1100 returned to the Senate for concurrence in the amendments introduced by the House, bearing the name: "AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, providing for acceptance of gifts or donations; and further providing for governing body of municipal authorities and for certain fiscal reporting." *Id.* at 551, 838 A.2d at 572. The Senate sent SB 1100 to the Senate Committee on Rules and Executive Nominations for review prior to concurrence. The committee made extensive revisions to SB 1100. The bill, originally five pages in length, came out of committee as a 127–page document. The revisions included, but were not limited to:

> [T]he repeal of Section 209(k) of the PICA Act, which, *inter alia,* had required arbitrators involved in resolving certain collective bargaining disputes to accord substantial weight to Philadelphia's financial plan and its ability to fund any relevant salary increases, and had, additionally, provided for judicial review of such awards; changes to the size and composition of the Pennsylvania Convention Center Authority's governing board, as well as the manner in

---

**10.** The Pennsylvania Supreme Court granted allowance of appeal in *Neiman* to determine the following:

> 1. Whether Pennsylvania [Act 152 of 2004] violates the single[-]subject rule of Article III, Section 3 of the Pennsylvania Constitution.
> 2. Whether, if Act 152 violates the single-subject rule of Article III, Section 3 of the

Pennsylvania Constitution, Megan's Law can be sustained by severance of the remaining portions of Act 152 of 2004.

*Commonwealth v. Neiman*, 611 Pa. 419, 27 A.3d 984 (2011). The Supreme Court entertained oral argument in *Neiman* on September 11, 2012.

which the Convention Center is governed; a transfer of authority over taxis and limousines in Philadelphia from the Public Utility Commission to the Philadelphia Parking Authority; a grant of new powers to the Parking Authority to develop mixed-use projects combining public parking facilities with commercial, residential, industrial, and retail components; an expansion of the bonding requirements for small contractors engaged in redevelopment activities within Philadelphia; the curtailment of oversight authority by Philadelphia's Finance Director over spending by the Parking Authority; and a prohibition on police officers participating in election campaigns.

*Id.* at 552–53, 838 A.2d at 572–73 (footnote omitted).

The Senate approved the new bill the same day it was reported out of committee, and it passed in the House the following day, which was the last day of session before the Thanksgiving Holiday. On January 23, 2003, the City of Philadelphia and its Mayor filed a petition for review before the Commonwealth Court, seeking declaratory judgment and injunctive relief, alleging, *inter alia,* a violation of Article III, Section 3, in the passage of SB 1100, specifically, the statute changing the composition of the Pennsylvania Convention Center Authority's governing board. *Id.* at 553–55, 838 A.2d at 573–74. The Commonwealth et al. filed preliminary objections in the nature of a demurrer and a motion to dismiss. The Commonwealth Court found, in relevant part, that the petitioners established a clear right to relief under Article III, Section 3, and the respondents appealed.

Examining cases involving issues of constitutionality under Article III, Section 3, our Supreme Court noted that in early cases, the Court applied a strict "germaneness" test. *Id.* at 587, 838 A.2d at 575–76

(citing *Commonwealth ex rel. Woodruff v. Humphrey,* 288 Pa. 280, 291, 136 A. 213, 217 (1927) (finding a bill regulating land surveyors and engineers contained two subjects, as they did not regulate the same profession); *Yardley Mills Co. v. Bogardus,* 321 Pa. 581, 185 A. 218 (1936) (holding that a bill containing three provisions, each of which pertained to water canals, violated the single-subject test, as they were not sufficiently germane to one another)). In more recent years, however, the Court observed extreme deference to the Legislature, validating bills under the single-subject test that included a range of topics, as long as they could "reasonably be viewed as falling under one broad subject." *City of Philadelphia,* 575 Pa. at 576, 838 A.2d at 587; *see, e.g., Common Cause/Pennsylvania v. Commonwealth,* 562 Pa. 632, 757 A.2d 367 (2000) (*per curiam*) (affirming the decision of the Commonwealth Court upholding a bill amending Title 75 (the Vehicle Code) and Title 74 (relating to transportation) as relating to a single subject, vehicular transportation). The Court found that "germaneness has, in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, over-arching topic to loosely relate the various subjects included in the statute under review." *City of Philadelphia,* 575 Pa. at 576–77, 838 A.2d at 587.

Although the Supreme Court agreed that "deference by hypothesizing reasonably broad topics in this manner is appropriate to some degree, [ ... ] [t]here must be limits [ ... ], as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement." *Id.* at 578, 838 A.2d at 588. In the case before it, the Supreme Court determined that SB 1100 violated the single-subject requirement of Article III, Section 3. It concluded there was "no single unifying subject to which all of the provi-

sions of the act are germane." *Id.* at 579, 838 A.2d at 589. Even accepting "municipalities" as the overarching subject, the statute at issue changing the composition of the Pennsylvania Convention Center Authority's governing board, was not germane to that topic, "as the Convention Center is not a municipal authority, but rather, an instrument of the Commonwealth." *Id.* at 580, 838 A.2d at 589–90. The Court found the fact that all of the provisions contained in the bill were codified under Title 53 was "of little constitutional importance" and that this similarity did not save SB 1100 from being held unconstitutional pursuant to Article III, Section 3. *Id.* at 581, 838 A.2d at 590.

In 2010, this Court, sitting *en banc*, decided the *Neiman* case,[11] which involved a constitutional challenge on Article III, Section 3 grounds to Senate Bill 92 of 2003 ("SB 92"), and specifically the statute contained therein pertaining to Megan's Law.[12] SB 92 began as an amendment to the Deficiency Judgment Act, was modified to add a "major amendment" to the Landlord Tenant Act of 1951, was further modified making minor additions and changes, including an amendment to the Municipal Police Education and Training Law, and finally, in its fifth revision, added the provisions pertaining to Megan's Law and deleting the amendments to the Landlord Tenant Act. *Neiman*, 5 A.3d at 358. The trial court found no violation of the single-subject rule, as all statutes included

in the bill affected Title 42 of the Judicial Code. *Id.* This Court, relying on our Supreme Court's pronouncement in *City of Philadelphia*, found that the fact that all statutes included in SB 92 were contained in a single title (here, Title 42), was constitutionally insignificant. *Id.* at 358–59. Rather, this Court found no unifying relationship between the several subjects included in SB 92.

The Court examined SB 92 in its final version, and based upon the layout of the bill and the volume of the bill dedicated to the subject, the Court determined that the primary purpose of SB 92 was to amend Megan's Law. *Id.* at 358. The Court concluded, however, that although SB 92 violated the single-subject rule, the provisions pertaining to Megan's Law were severable. *Id.* at 359 ("[W]here a bill violates the single subject rule, the extraneous, unconstitutional provisions may be severed so as to preserve the main subject of the bill as constitutional.").[13] Thus, the Court sustained Megan's Law in its entirety, and struck the remaining provisions of SB 92 as unconstitutional.[14] *Id.* at 360.

■ In light of this precedent, we turn to the case *sub judice*. The legislative history of SB 646 reveals that it was first introduced by Senators Rocks and Fumo on March 19, 1987, containing a single provision regarding the appointment of substitute bail commissioners in Philadelphia. *See* Pa.S.Res. 646 of 1987 (Printer's

---

**11.** *Neiman* was filed on September 8, 2010. Curiously, the trial court in this case did not acknowledge this precedential decision in its December 20, 2011 decision. Although the Supreme Court granted allowance of appeal of *Neiman* on August 10, 2011, our *en banc* decision in that case remains binding precedent unless and until it is overturned by our Supreme Court. *Sorber v. Am. Motorists Ins. Co.*, 451 Pa.Super. 507, 680 A.2d 881, 882 (1996).

**12.** 42 Pa.C.S.A. §§ 9791–9799.9.

**13.** The Court in *Neiman* found that the unconstitutional provisions of the act could be severed pursuant to Section 1925 of the Statutory Construction Act, which we discuss in greater detail *infra*.

**14.** On October 19, 2010, this Court issued a *per curiam* Order granting the Pennsylvania General Assembly's petition to intervene and for a stay of the Court's decision pending review by the Pennsylvania Supreme Court. *Commonwealth v. Neiman*, 2010 WL 4117667 (Pa.Super. Oct. 19, 2010).

Number 728). It was referred to the Senate Judiciary Committee the same day. *Id.* On October 6, 1987, a minor amendment to the existing provision was made, and on January 27, 1988, the bill underwent minor changes by the Judiciary Committee. Pa.S.Res. 646 of 1987 (Printer's Number 1424). The Senate finally considered and passed SB 646 on November 18, 1987.

SB 646 was sent to the House for consideration, which referred the bill to the House Judiciary Committee on November 23, 1987. On January 27, 1988, the bill came out of committee with the addition of a provision for sentences for offenses committed while impersonating a law enforcement officer. Pa.S.Res. 646 of 1987 (Printer's Number 1739). On February 24, 1988, the third day the House was to vote on SB 646, a number of significant amendments were made, including but not limited to, the addition Section 722 regarding direct appeals to the Pennsylvania Supreme Court from the Court of Common Pleas in specified circumstances, Section 8305 prohibiting actions for wrongful birth and wrongful life, Section 8306 limiting the defenses available for a claim of an injury that occurred in utero, Section 8933 calling for the dismissal of criminal cases in prescribed circumstances, and Sections 9541–

9546—the Post Conviction Relief Act—which replaced the Post Conviction Hearing Act. Pa.S.Res. 646 of 1987 (Printer's Number 1829).

All of the above-listed amendments were presented to the House on February 24, 1988. The majority of the House, without much, if any, debate or discussion, agreed to most of the amendments. Sections 8305 and 8306 were the exceptions, however, as a lengthy debate over the propriety of these amendments ensued.[15] The House separately agreed to all amendments, including Sections 8305 and 8306, and SB 646 passed the same day. SB 646 ultimately passed in the Senate on March 22, 1988, and was signed in the Senate that day. It was signed in the House on April 5, 1988, and on April 13, 1988, Governor Casey signed the bill into law as Act 47 of 1988.

Looking at all of the amendments included in the final version of SB 646, we can discern no single overarching subject to which they all relate. That all of the amendments are encompassed by a single Title (Title 42) is insufficient to overcome an Article III, Section 3 challenge. *See City of Philadelphia,* 575 Pa. at 581, 838 A.2d at 590; *Neiman,* 5 A.3d at 358–59.[16] Moreover, Title 42 contains a veritable pot-

**15.** Representative Freind presented the amendments regarding Sections 8305 and 8306, indicating that they were "almost identical" to the bill that had been vetoed by Governor Thornburgh in 1984, and that he had personally spoken to Governor Casey who stated he agreed with the legislation and would sign it into law if it passed. Pa.H.R. Legis. Journal, 172D Sess. 14, at 304 (1988). At the request of Representative Ryan, the Democratic and Republican representatives met with their respective Caucuses during a break in session for less than an hour to discuss these two amendments. At the conclusion of those meetings, various members of the House questioned Representative Freind, some voicing support of the amendments, some vehemently against. *See id.* at 307–16.

**16.** The trial court attempts to differentiate this case from *City of Philadelphia* by stating that the Court in that case "did not address the issue of whether amendments to the Judicial Code comprise a single subject." Trial Court Opinion, 12/20/11, at 8. The trial court reasoned that although the Supreme Court "held that the topic of 'municipalities' is too broad, [ ... ] it did not expressly disapprove of the reasoning in [*NCPaTLA*] concerning amendments to the Judicial Code." *Id.* In so holding, the trial court ignores the Supreme Court's clear pronouncement that the fact that all amendments are contained in a single Title is constitutionally irrelevant for Article III, Section 3 purposes. *See City of Philadelphia,* 575 Pa. at 581, 838 A.2d at 590.

pourri of legislation, ranging from magisterial district judges to financial management, from DNA testing to jurisdictional considerations, and addresses matters of juvenile, civil, and criminal law and procedure. There can be no argument that these diverse areas of the law are part of the same "legislative scheme" or that they are all "germane" to one another." [17] *See Payne*, 168 Pa. at 386, 31 A. at 1072; *City of Philadelphia*, 575 Pa. at 575, 838 A.2d at 587.

Having found a violation of the single subject rule, we must determine, "[k]eeping in mind the trepidation with which the judiciary interferes with the process by which the General Assembly enacts the laws," whether as a matter of law, there exists "a single unifying subject to which most provisions of the act are germane." *See PAGE*, 583 Pa. at 309, 877 A.2d at 404. Upon examination of each of the amendments and the subjects to which they pertain, we conclude that the main objective of the bill to which the majority of the provisions relate is post-trial matters in criminal cases. Only four of the 12 provisions included in SB 646 are not germane to that subject, *i.e.*, Section 8305 (precluding actions for wrongful birth and wrongful life), Section 8306 (limiting defenses available for injuries sustained in utero), Section 8933 (providing for the dismissal of certain criminal cases at the preliminary hearing stage), and Section 1125 (providing for the appointment of substitute bail commissioners in Philadelphia). The remaining provisions—Section 722 (regarding direct appeal to the Supreme Court of death sentences from the Court of Common Pleas), Section 9719 (regarding sentences for offenses committed while impersonat-

ing a law enforcement officer) and Sections 9541–9546 (the Post Conviction Relief Act)—all bear a "proper legislative relation to each other" and "assist in carrying out [the] bill's main objective," *to wit*, they all relate to post-trial matters in criminal cases. *See Payne*, 168 Pa. at 386, 31 A. at 1072; *City of Philadelphia*, 575 Pa. at 575, 838 A.2d at 587. Furthermore, SB 646 was 14 pages in length at the time it was signed into law, less than two pages of which addressed the offending provisions. *See Neiman*, 5 A.3d at 358 (suggesting the number of pages devoted to the amendments contained in a bill is a relevant consideration under the single-subject rule).

We therefore conclude that "post-trial matters in criminal cases" is a reasonably broad topic that exhibits due deference to the General Assembly within the limits of the single-subject rule of Article III, Section 3. *See City of Philadelphia*, 575 Pa. at 578, 838 A.2d at 588. Having also concluded that four of the amendments contained in SB 646—Sections 1125, 8305, 8306, and 8933—are not germane to the primary purposes of the bill, we must now ascertain whether they are severable from the bill such that the remaining provisions that are germane to the stated single subject may still stand.

The law is clear that provisions within every statute are severable. 1 Pa.C.S.A. § 1925. If a portion of a statute is invalidated for any reason, the remaining, valid provisions shall be unaffected unless the court determines: (1) the remaining provisions of the statute depend upon and are inseparable from the void portion of the

---

17. Although there are subchapters under Title 42 that are germane to a unifying subject, that is not so for Title 42 on the whole, and thus, it cannot be the legislative nexus used to defeat a single-subject challenge. To the contrary, to say that Title 42 is the single subject to

which all amendments relate is truly akin to saying that amendments to a bill relate to the single subject of "law." *See City of Philadelphia*, 575 Pa. at 578 n. 20, 838 A.2d at 588 n. 20.

statute; (2) it does not appear the General Assembly would have enacted the valid provisions without the invalidated one; or (3) the remaining provisions are incomplete and cannot be executed in accordance with the intent of the General Assembly without the void portion of the statute. *Id.; see also PAGE*, 583 Pa. at 308–09, 877 A.2d at 403.

Our Supreme Court and this Court have long applied this mandate to bills found to contain unconstitutional provisions under Article III, Section 3. *See, e.g., Payne*, 168 Pa. at 386, 31 A. at 1072; *PAGE*, 583 Pa. at 308–09, 877 A.2d at 403;[18] *Neiman*, 5 A.3d at 359–60. In *PAGE*, for example, our Supreme Court was faced with several constitutional challenges, including a challenge on single-subject grounds, to Act 71 of 2004 ("Act 71"), the Pennsylvania Race Horse Development and Gaming Act. The Court found that the single unifying subject of Act 71 was the regulation of gaming. It further found that although most of the provisions contained in the Act were germane to the subject of gaming, two provisions—calling for the disbursement of funds from the State Gaming Fund to the Volunteer Fire Company Grant Program and to recipients of benefits under the Forest Reserves Municipal Financial Relief Law—were not. *PAGE*, 583 Pa. at 307–08, 877 A.2d at 402–03. It found, however, that these outlier provisions were severable from Act 71. In addition to relying on the express intention of the General Assembly that all provisions of the Gaming Act are severable, the Court found the remaining factors set forth in Section 1925 required severance of the unconstitutional provisions:

> First, as they are not germane to the single subject of the regulation of gaming, they are clearly not essentially and inseparably connected with the rest of the Act. Second, the remaining valid provisions are certainly capable of being executed in accordance with legislative intent in the absence of this limited number of disbursement provisions.

*Id.* at 308–09, 877 A.2d at 403.

In the case before us, we do not hesitate to conclude that Sections 1125, 8305, 8306, and 8933 are severable from SB 646. Like the unconstitutional provisions in *PAGE*, these amendments are not germane to the single subject of SB 646—post-trial matters in criminal cases—and thus the remaining provisions are not dependent upon or inseparable from the unconstitutional amendments. Second, there is no indication that the remaining provisions would not have been passed without the offending amendments. To the contrary, each of the amendments contained in SB 646 received a separate vote in the House prior to being included in the bill (*see* Pa.H.R. LEGIS. JOURNAL, 172D Sess. 14, at 303–25), and the Senate likewise voted on the amendments, and then separately debated the propriety of including Section 8305 (*see* Pa.S. LEGIS. JOURNAL, 172D Sess. 19, at 1959–66). This leads to the conclusion that the Legislature would have enacted the valid provisions of SB 646 regardless of the inclusion or exclusion of the invalid provisions. Finally, the non-germane amendments are entirely separate from

---

18. In addition to relying upon 1 Pa.C.S.A. § 1925 regarding severability, the Court in *PAGE* also had a clear statement from the General Assembly that the statutes at issue were severable. *See PAGE*, 583 Pa. at 308, 877 A.2d at 403 (recognizing "the General Assembly's clear and expressly stated intention that the invalidity of any provisions of the Act 'shall not affect other provisions or applications[.]' ") (citing 4 Pa.C.S.A. § 1902(a)). Such express statements are not required in order for courts to sever unconstitutional provisions of an act from those that pass constitutional muster. *See Payne*, 168 Pa. at 386, 31 A. at 1072; *Neiman*, 5 A.3d at 359–60; 1 Pa.C.S.A. § 1925.

**1266** ■

the remaining provisions, which can be executed in accordance with the General Assembly's intent on their own.

In summary, we conclude that the primary purposes SB 646, signed into law as Act 47, was to address post-trial matters in criminal cases. Most of the amendments contained in SB 646 are germane to that primary purpose. Four amendments— Section 1125 (regarding the appointment of substitute bail commissioners in Philadelphia), Section 8305 (prohibiting a cause of action for wrongful birth and wrongful life), Section 8306 (limiting the defenses available for injuries sustained in utero), and Section 8933 (regarding the dismissal of felony criminal actions at the preliminary hearing level)—are not germane to that primary purpose, and thus are unconstitutional under the single-subject rule of Article III, Section 3 of the Pennsylvania Constitution.[19] Those four provisions, however, are severable from the remainder of Act 47, and thus are the only provisions stricken.

Appellants filed their complaint, alleging that because of Appellees' professional negligence, they did not know that Samuel was doomed to be born suffering from F.D., and thus they did not seek to abort Rebecca's pregnancy rather than bring a child into the world that would suffer from the effects of this disease. The trial court dismissed the complaint, granting Appellees' preliminary objections on the basis that the causes of action are precluded by 42 Pa.C.S.A § 8305. As the statute has been declared unconstitutional, we reverse the trial court's grant of the preliminary objections, reinstate the amended complaint and remand the case for further proceedings. *See Glen–Gery Corp. v. Zoning Hearing Bd. of Dover Twp.*, 589 Pa. 135, 152, 907 A.2d 1033, 1043 (2006) (stating that "an unconstitutional statute is ineffective for any purpose; it is as if it were never enacted") (citations omitted).

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

McEWEN, P.J.E. joins the majority Opinion.

FORD ELLIOTT, P.J.E. files a Concurring Statement in which McEWEN, P.J.E. joins.

CONCURRING STATEMENT BY FORD ELLIOTT, P.J.E.:

As the author of this court's *en banc* decision in *Commonwealth v. Neiman*, I join the Majority in holding that 42 Pa. C.S.A. § 8305 was unconstitutionally enacted. I write separately to note that regardless of this statute, a cause of action for "wrongful life" has never been recognized as a legally cognizable action at law in this Commonwealth. *Ellis v. Sherman*, 330 Pa.Super. 42, 478 A.2d 1339 (1984), *affirmed*, 512 Pa. 14, 515 A.2d 1327 (1986); *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496 (1979) (*en banc*), *affirmed in part, reversed in part*, 497 Pa. 77, 439 A.2d 110 (1981).

---

**19.** Although not relevant to the determination of constitutionality, we observe that this disposition affects very few decided cases. Section 8933 has never been cited for its substantive propositions in any published decision before any court in this Commonwealth, and Section 1125 was amended and passed again by the General Assembly in 2008, and thus is untouched by this decision. Sections 8305 and 8306 likewise have not been fodder for many reported cases in this Commonwealth as would be expected since those statutes prohibited bringing claims or defenses in certain circumstances.